**The PROCTER & GAMBLE COMPANY and The Procter & Gamble Distributing Company, Plaintiffs,**

**v.**

**Randy L. HAUGEN, individually and dba Freedom Associates, Inc. and Freedom Tools Incorporated, Utah corporations; Roger D. Patton, individually; Jeffrey G. Musgrove, individually and dba Musgrove Enterprises; Steven E. Brady, individually; Stephen L. Bybee, individually; Eagle Business Development, Inc., a Utah corporation; Ted Randal Walker, individually; Walker International Network, a Texas corporation; John Does 1–5; and Amway Corporation, a Michigan corporation, Defendants.**

**No. 1:95 CV 0094 K.**

United States District Court, D. Utah, Central Division.

April 17, 1998.

UT, William J. Abraham, Rick J. Abraham, Columbus, OH, Scott Daniels, Salt Lake City, UT, for Randy L. Haugen, d/b/a Freedom Associates, Inc.

Julianne R. Blanch, Snow, Christensen & Martineau, Joseph J. Joyce, Strong & Hanni, Scott Daniels, Salt Lake City, UT, for Freedom Tools, Inc.

Julianne R. Blanch, Snow, Christensen & Martineau, Joseph J. Joyce, Strong & Hanni, Salt Lake City, UT, for Freedom Associates, Inc.

James D Gilson, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, Sandra L. Crosland, Van Cott, Bagley Cornwall & McCarthy, Ogden, UT, for Jeffery G. Musgrove.

James D Gilson, Sandra L. Crosland, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, for Musgrove Enterprises.

Joseph J. Joyce, Kristin A VanOrman, Strong & Hanni, Salt Lake City, UT, for Steven E. Brady, Stephen L. Bybee, Eagle Business Development, Inc., Ted Randal Walker and Walker International Network.

Dale J. Lambert, Christensen & Jensen, Edwin C. Barnes, Gainer M. Waldbillig, Clyde, Snow & Swenson, Salt Lake City, UT, Sean M. Sullivan, Timothy Q. Delaney, James R. Sobieraj, Michael H. Baniak, Brinks, Hofer, Gilson & Lione, Chicago, IL, David B. Watkiss, Watkiss, Dunning & Watkiss, Salt Lake City, UT, Michael A. Mohr, Albertus Hultink, Sharon D. Grider, Amway Corporation, Ada, MI, for Amway Corp.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

The allegations of The Procter & Gamble Company and The Procter & Gamble Distributing Company (collectively, "P & G") have been previously chronicled. *See Proctor & Gamble Co. v. Haugen,* 947 F.Supp. 1551 (D.Utah 1996). Presently before the court, and considered in turn in this order, are seven primary motions, as well as a variety of motions ancillary to them.

Tracy Fowler, Robert S. Campbell Jr., William H. Christensen, Sean N. Egan, Campbell, Maack Sessions, Salt Lake City, UT, Thomas S. Calder, John E. Jervicky, Robert Heuck, II, Robert Heuck, Frederick N. Hamilton, Kate Moriarty, Kimberly Ellen Eliot, Steven H. Ray, Frances L. Figetakis, Carl J. Stich, Mark C. Gaylo, Dinsmore & Shohl, Cincinnati, OH, Stanley M. Chesley, Theresa L. Groh, Waite, Schneider, Bayless & Chesley, L.P.A., Salt Lake City, UT, for Procter & Gamble Co. and Procter & Game Distributing Co.

Julianne R. Blanch, Snow, Christensen & Martineau, Joseph J. Joyce, Kristin A. VanOrman, Strong & Hanni, Salt Lake City,

## A. Musgrove's and Patton's Motion to Dismiss.

Two of the individually named defendants, Roger Patton and Jeffrey Musgrove (and his dba, Musgrove Enterprises), move to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the *Federal Rules of Civil Procedure.* Both are Texas residents who are involved in this suit because they passed the Satanism rumor over the Amvox voice messaging system. In April of 1995, Patton, living in Woodlands, passed the rumor to Musgrove, living in Katy, who allegedly passed the message to Randall Walker in Houston, who in turn, passed the message to Randy Haugen in Ogden, Utah. Haugen and his immediate upline sponsor, Don Wilson, live in Ogden and conduct their Amway businesses there.

### 1. Standard.

The principles applicable to this court in determining whether to assert personal jurisdiction were explicated by Judge Winder in *Harnischfeger Engineers v. Uniflo Conveyor, Inc.,* 883 F.Supp. 608 (D.Utah 1995), and are only partly restated here. Personal jurisdiction can be either general or specific. General jurisdiction is proper if "the defendant has had continuous and systematic general business contacts with the forum such that the defendant could reasonably anticipate being haled into the forum's court." *Id.* at 612 *(internal quotation marks and citation omitted).*

Whether specific jurisdiction is proper depends on the basis of the court's subject-matter jurisdiction. Here, subject-matter jurisdiction is based upon the existence of a federal question and diversity of citizenship. *See 28 U.S.C. §§ 1331–32.* To the extent subject-matter jurisdiction is based upon the existence of a federal question, specific jurisdiction is proper as long as it is consistent with the requirements of federal due process. To the extent subject-matter jurisdiction is based upon diversity of citizenship, specific jurisdiction is proper if: (1) the defendant's act is one of those listed in Utah's Long–Arm Statute, *Utah Code Ann. § 78–27–24;* (2) a nexus exists between the plaintiff's claim and the defendant's acts or contacts; and (3) the exercise of jurisdiction is consistent with the requirements of federal due process. *Harnischfeger,* 883 F.Supp. at 612–13.

P & G asserts that the court has both general and specific jurisdiction over these defendants.

### 2. Musgrove's and Patton's Contacts.

Musgrove and Patton are both in the Haugen/Wilson organization, in the sense that they were recruited or sponsored by a distributor whose Amway chain of sponsorship included Wilson and Haugen. Musgrove is separated from Haugen by approximately 18 sponsor "links" and from Wilson by approximately 19. At the time Musgrove became an Amway distributor, his immediate upline Diamond distributors were Utah residents Kelly and Connie Robbins.

Musgrove's contacts with Utah consist of: (1) yearly attendance at an Amway-endorsed seminar in Utah between 1989 and 1995 and active promotion of the seminar to other Amway distributors, (2) in-person business discussions with Kelly Robbins, Haugen, and Wilson in Utah immediately before such seminars in some years, (3) paid, speaking engagements at three seminars in Utah sponsored by Wilson and receipt of instructions and payment from Wilson for speaking at each of ten to twelve Wilson-sponsored seminars held elsewhere, (5) communications with Wilson via fax regarding Musgrove's efforts to locate seminar facilities for Wilson in Texas, (5) receipt from Wilson of payment for selling tickets to Wilson-sponsored seminars, (6) approximately 181 Amway-related telephone calls to his Utah uplines over a two and one-half year period, (6) receipt of 50–60 Amvox messages originally sent by Haugen and Wilson, and (7) purchase of business planning calendars from a Utah merchant.

Patton is separated from Musgrove by at least three sponsor links. Patton's contacts with Utah consist of: (1) attendance at two or three of the annual Amway-endorsed seminars over a five-year period, (2) promotion of the seminar to his downline recruits, (3) receipt of Amvox messages originally sent by

Haugen and Wilson, and (4) purchase of Haugen motivational tapes.

### 3. General Jurisdiction.

■ To establish the existence of general jurisdiction, P & G argues that the contacts of Musgrove and Patton demonstrate continuous and systematic contact in furtherance of their Amway businesses. And indeed, Musgrove and Patton acknowledge that, although all Amway distributors act independently, they deal with each other frequently because Amway products are distributed through a complex multi-level marketing structure. Under this structure, distributors have an incentive to recruit new distributors and assist in the development of their businesses because they receive a portion of a commission on the sales made by distributors "under them."

As a result of this structure, each individual distributor is simultaneously the leader of a group consisting of the distributors under him and a member of, depending on the perspective, any number of groups lead by distributors upline. That Haugen's group was an operative one for Musgrove is evident from the fact that Musgrove sent an Amvox message to Haugen thanking him for leading the group as well as by references to the Haugen group that Musgrove made in Amway-endorsed speeches and by the course of dealing and communication between the two.

It is apparent from Musgrove's deposition testimony that Haugen was actively mentoring the distributors in his downline organization, including Musgrove. It is similarly apparent from Musgrove's deposition testimony that such mentoring—the provision of business and motivational support—can constitute a significant, or even core, aspect of a distributor's business.

Musgrove, for example, testified that his Amway business consisted of supplying products to his downline distributors and giving them advice on how to build their businesses, but that this role or "responsibility" of "helping people" had increased as his organization had grown. When Patton was similarly asked in a deposition to describe what he did as an Amway distributor, he responded that he "recruited other distributors and taught them to do the same." He stated that "an active part of being a distributor is being on the tapes and going to the functions and things." Patton testified that it was a corresponding Amway principle for downlines to "edify" their uplines, that is, to show "respect" for them and "build them up."

Although Musgrove and Patton did, in this sense, have an ongoing and systematic business relationship with Haugen, it is not sufficient to give this court general jurisdiction over them. Musgrove's and Patton's Utah contacts involve them in their role as beneficiaries of the efforts of Haugen and Wilson to train and motivate their downlines and in their corresponding role as supporters of their upline leaders. Those roles do not constitute a significant enough aspect of *their* businesses to warrant this court's assertion of general jurisdiction over them. For this court to so assert, Musgrove and Patton must have "pervasive general business contacts" with Utah, such as Utah bank accounts, Utah offices, and Utah employees. *See Harnischfeger*, 883 F.Supp. at 612. Neither defendant's contacts rise to that level of substantiality.

### 4. Specific Jurisdiction.

Consistency with federal due process rights by itself enables this court to exercise specific jurisdiction based on the existence of a federal question, but constitutes only one of the three required elements necessary for this court to exercise specific jurisdiction based on diversity of citizenship. The latter, more comprehensive analysis is undertaken first.

The first part of the analysis is satisfied with regard to both defendants. Utah's Long–Arm Statute subjects any person who does any of certain enumerated acts to the jurisdiction of the courts of Utah for claims arising from those acts as a matter of law. P & G does not specifically identify the enumerated acts that it asserts these defendants have performed, but three seem possible: (1) transacting any business within Utah, (2) contracting to supply services or goods in Utah, and (3) causing any injury within Utah

whether tortious or by breach of warranty. *Utah Code Ann. § 78–27–24(1)–(3).*

■ By attending the annual Utah conferences, Musgrove and Patton transacted business within Utah. The broad definition of "transacted business" set forth by statute includes the activities of a non-resident "which affect persons or businesses within the state of Utah." *Utah Code Ann. § 78–27–23; see also Harnischfeger,* 883 F.Supp. at 614 *(reviewing "broad interpretations" of definition).* Musgrove's additional acts of speaking in Utah and receiving payment for doing so heighten the applicability of the "transacting business" subsection to him and also place him within the scope of the subsection concerning those who contract to supply services here.

■ Assuming that Musgrove's and Patton's act in spreading the Satanism rumor caused injury to P & G within Utah, their conduct arguably falls within the third section. However, Utah courts have held that injury occurring in Utah is not a sufficient basis for the exercise of specific jurisdiction. *Harnischfeger,* 883 F.Supp. at 613.

■ The second part of the analysis requires the existence of a nexus between P & G's claims and the defendants' Utah activities. Specifically, and tracking the language of Utah's Long Arm Statute, P & G's claims must "arise from," as opposed to merely "relate to," Musgrove's and Patton's contacts with the State of Utah. *Harnischfeger,* 883 F.Supp. at 617. Although the nexus requirement is narrowly construed, this part is also satisfied with regard to both defendants.

The Amvox voice messaging system was provided by Amway to facilitate communication between distributors up and down the line—to enable them to receive information and encouragement and to send information and encouragement back. When Musgrove and Patton transmitted the Satanism rumor over Amvox, they did so in an effort to share information that they believed would be useful and beneficial to other Amway distributors. P & G's claims against Musgrove and Patton arise or spring from this ongoing effort to develop and foster mutually benefi-

cial relationships with other distributors in the Haugen group.

The final part of the analysis is satisfied if the court finds both (1) "that certain minimum contacts exist between" Utah and the defendants and (2) that exercising jurisdiction over the defendants does "not offend traditional notions of fair play and substantial justice." *Harnischfeger,* 883 F.Supp. at 614 *(internal citations omitted).*

■ The minimum contacts requirement is satisfied if the defendants have purposefully availed themselves of the privilege of conducting activities in Utah. This requirement is satisfied with respect to Musgrove, but not with respect to Patton. Musgrove's availment of the privilege of conducting activities in Utah is demonstrated by his numerous telephonic communications to individuals in Utah in furtherance of his Amway business, his attendance at seminars and informal mentoring sessions in Utah, his speaking engagements in Utah, and his interactions with Haugen and Wilson in furtherance of their common Amway group. Patton's contacts do not demonstrate the same degree of active availment.

■ The fair play and substantial justice requirement "essentially asks whether asserting jurisdiction over a non-resident defendant would be fair." *Harnischfeger,* 883 F.Supp. at 615. Such considerations "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id. (internal quotation marks and citation omitted).*

■ Relevant factors include: "(1) the burden on the defendants; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Harnischfeger,* 883 F.Supp. at 615 *(internal quotation marks and citation omitted).* Consideration of these factors, especially factors (3) and (4), leads again to the conclusion that the exercise of

jurisdiction over Musgrove would be fair. Relevant factors include the relatively close association between Musgrove and the other Utah defendants with respect to the issues raised by this lawsuit and the fact that P & G will not be able to litigate its claims with respect to this matter in one forum without inconveniencing at least some defendants.

### 5. Conclusion

Accordingly, Musgrove's motion to dismiss for lack of personal jurisdiction is denied. Patton's motion to dismiss for lack of personal jurisdiction is granted.

### B. P & G's Motion for Leave to File a Fourth Amended Complaint.

P & G seeks leave to file a fourth amended complaint, adding claims for (1) fraud, (2) negligence, (3) breach of contract, and (4) injurious falsehood/product disparagement.

### 1. Standard.

Under Rule 15(a) of the *Federal Rules of Civil Procedure,* the decision to grant leave to amend a complaint after the permissive period is within the trial court's discretion, and leave is to be freely given when justice so requires. *See Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir.1994) *(internal quotation marks and citation omitted).* "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir.1993) *(internal citations omitted).* Moreover, "[i]t

is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend." *Id.*

 Timeliness is determined by reference to any court-ordered deadline for amending the pleadings. *See id.,* at 1366. In a Scheduling Order dated November 6, 1996, Magistrate Judge Ronald N. Boyce set May 1, 1997, as the cutoff for amended pleadings in this case. Because that deadline was embodied in a scheduling order, an additional standard applies. "Scheduling orders are not to be modified by the trial court except when authorized by local rules upon a showing of good cause." *Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1518 (10th Cir.1990) *(interpreting Fed.R.Civ.P. 16(f)).*[1]

### 2. Discussion.

P & G's motion to amend was submitted on September 10, 1997, and is, therefore, untimely. However, untimeliness is not the only factor upon which this court's determination to deny P & G's motion is based.

 P & G has not adequately explained its failure to include the newly-proposed claims in its third amended complaint, which was filed on December 18, 1996. In fact, P & G essentially admits that the factual allegations that support its newly-proposed legal theories were known at the time P & G filed its third amended complaint. P & G nonetheless asserts that it is not engaged in the seriatim presentation of legal theories—a practice that was expressly disapproved of by the Court of Appeals for the Tenth Circuit. *See Pallottino,* 31 F.3d at 1027.

---

1. This court has reviewed the transcript of the colloquy between Judge Boyce and Tracy Fowler, counsel for P & G, that occurred during the telephonic hearing on April 25, 1997. In denying P & G's motion to extend the May 1st cutoff, Judge Boyce stated, "If there is a request to amend the pleadings beyond May 1st, then there will have to be the requisite showing of good cause and other things that would justify the amendment." Fowler responded by stating, "[O]f course any request we make to amend the pleadings is going to have to meet the threshold showing of Rule 15." To which Judge Boyce replied, "Well, that's in effect what I've done . . . and one of the things you'll probably have to establish that you would not have to establish if

there were an open period is that you would have to show why you couldn't have made your request for an amendment at an earlier date." Although the potential for confusion is apparent, it is the conclusion of this court that Judge Boyce did not thereby waive application of Rule 16(f)'s "good cause" standard.

Nor did Judge Boyce alter the May 1st cutoff for timely amendments during the hearing on August 8, 1997. During that hearing, Judge Boyce, citing considerations of judicial administration and litigation management, established for the first time an outside cutoff date beyond which even motions to amend would not be permitted—September 10, 1997.

P & G has repeatedly and candidly admitted that the reason it seeks to amend its complaint is to enable it to obtain the discovery it has tried to obtain since the inception of the case—discovery that P & G believes has been prevented by an overly-restricted construction of its second amended complaint. While P & G's discovery efforts may have been improperly restricted, a matter that is discussed below, that fact does not explain its failure to earlier advance the full range of legal theories under which it may be entitled to relief.

### 3. Conclusion.

Accordingly, P & G's motion for leave to file a fourth amended complaint is denied.

### C. Amway's Motion for Sanctions for P & G's Destruction of Relevant Evidence.

Amway moves for sanctions against P & G, alleging that P & G violated its duty to preserve relevant information. Specifically, Amway alleges that P & G was under a duty to save all of its corporate e-mail communications during the pendency of this litigation and that P & G failed to do so until March 5, 1997. Even then, Amway alleges that P & G failed to either search or save the e-mail communications of five key employees that P & G itself identified as having relevant information in its second supplemental Rule 26(a)(1) disclosures, filed on February 20, 1997.

### 1. Standard.

 Pursuant to both this court's inherent power and Rule 37(b)(2) of the *Federal Rules of Civil Procedure*, this court has the power to impose sanctions "against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information." *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984). While the duty to preserve preexists the imposition of a discovery ruling, "the case law reveals that Rule 37(b)(2) has been invoked only

against parties who have disobeyed a discovery ruling of some sort." *Brandt v. Vulcan*, 30 F.3d 752, 756 (7th Cir.1994). "Rule 37 sanctions, then, are appropriate here if, and only if, [P & G] violated a discovery order." *Id.*

 Amway tacitly concedes that no such discovery order is in place and instead asks the court to impose sanctions pursuant to its inherent authority by applying the evidentiary doctrine of spoliation. Under that doctrine, "the bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997). Because mere negligence in losing or destroying a document does not support an inference that the party was conscious of a weakness in its case, the "adverse inference must be predicated on the bad faith of the party destroying the records." *Id.*

### 2. Discussion.

 Amway argues that bad faith should be inferred from P & G's refusal to save its corporate e-mail communications in spite of P & G's clear understanding of its duty to do so, as demonstrated by P & G's tenacious insistence that Amway save all of its corporate e-mail communications until relevant material could be segregated out and by P & G's further request that Amway save the tapes containing the stored e-mails even after relevant material had been segregated on the grounds that "conceivably another party may have a request for information or another issue may come to light."

This court cannot determine that P & G acted in bad faith on the present record. Again, while the duty to preserve evidence exists independently of court order, a court order would have delineated the scope of P & G's duties, provided clear evidence that P & G was on notice of the relevance of the e-mail communications, and furnished a standard by which this court could judge the adequacy of P & G's production efforts. Whether the searches P & G conducted of its e-mail data-

bases before deleting data were adequate to discharge P & G's duties at the time points in the litigation during which the searches were conducted simply cannot now be fairly judged, with one exception.

■ P & G's failure to search or preserve the e-mail communications of the five individuals that P & G had itself identified as having relevant information constitutes a sanctionable breach of P & G's discovery duties. P & G's own identification of these individuals belies any possible claim that P & G was not on notice that their e-mail communications would be relevant. P & G is hereby sanctioned $2,000 for each of the five referenced individuals. P & G shall pay to Amway a total of $10,000 forthwith.

### 3. Conclusion.

Amway's motion for sanctions is denied except as provided in the preceding section.[2]

### D. P & G's Rule 72(a) Objection to Magistrate's Order re Search Terms.

P & G objects to an order issued by Judge Boyce that limits the scope of a keyword search that P & G desired to conduct of Amway's electronic databases. On October 28, 1996, Judge Boyce entered an order granting P & G the right to search Amway's electronic database with 25 search terms, which P & G was to propose. Amway objected to the 25 terms P & G proposed, which objection was sustained by Judge Boyce on February 25, 1997, when he entered the order now at issue.

Specifically, P & G objects to a provision in the order stating, "The relevant information for search would be matters that would show any communication, including those from Amway distributors, that would relate to anything about alleged improper references or characterization of Procter & Gamble and its products as related to or associated with Satanism or like references."

### 1. Standard.

Pursuant to Rule 72(a) of the *Federal Rules of Civil Procedure*, a district judge "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."

### 2. Discussion.

■ Under Rule 26(b)(1), a party is entitled to discovery regarding "any matter, not privileged, which is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery, or other claim or defense of any other party." "Relevancy required as to the production of documents is not equated with that ordinarily used in determining the admissibility of evidence. The test is the relevancy to the subject matter which is broader than the relevancy to the issues presented by the pleadings." *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1187 (D.S.C.1974).

■ P & G's objection is well taken to the extent that the order limits discovery of issues concerning "agency" and "control" to matters pertinent to the Satanism rumor as opposed to such control in general. The degree of supervisory control Amway exercises over its distributors in other realms is relevant to the issue of Amway's ability and duty, if any, to control dissemination of the Satanism rumor.

■ P & G's objection is also well taken to the extent that the order prevents discovery relevant to P & G's claims of unfair competition and deceptive trade practices. However, P & G's objection is not sustained to the extent that the search terms proposed by P & G would, as Judge Boyce feared, yield either "general commercial or competitive information" or a volume of documentation that "would be so extensive as to render the search unwieldy for any purpose legitimately within the current framework of the litigation."

2. Given this decision, the court considers neither Defendants Haugen, Walker, Brady, and Bybee's Joinder in Amway's Motion for Sanctions for P & G's Destruction of Relevant Evidence nor P & G's opposition thereto.

### 3. *Conclusion.*

P & G's objection is sustained to the extent outlined above and the order issued by Judge Boyce on February 27, 1997, is hereby modified accordingly.[3] P & G shall revise its list of 25 proposed search terms and resubmit them as required by Judge Boyce's minute entry dated October 25, 1996 (*File Entry No. 131* ).

### E. Amway's Motion for Summary Judgment on Damages.

Amway moves for summary judgment on damages, arguing that P & G cannot establish causation with respect to the three types of damages P & G claims: (i) out of pocket costs combating the rumor, (ii) lost sales, and (iii) disgorgement of benefits received by the defendants. The individually-named distributors join in Amway's motion. P & G has filed an opposition memorandum, a motion to strike Amway's summary judgment motion on the grounds that portions of Amway's statement of undisputed facts are unsupported by competent evidence, and a Rule 56(f) Affidavit.

### 1. *Standard.*

■ A defendant may not move for summary judgment on the ground that the plaintiff lacks evidence by simply asserting that the plaintiff lacks sufficient evidence to reach a jury. The defendant must first create, through the discovery process, a record for the district court to review. The defendant may then discharge its burden of production by pointing the district court to specific places in the record where the plaintiff was asked to produce evidence and failed to do so. As the Supreme Court has explained, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's

case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).

### 2. *Discussion.*

While Amway has directed the court to specific instances in the record where P & G's witnesses have been unable to substantiate P & G's damage theories, these instances do not demonstrate the absence of genuine issues of material fact as much as they reflect the reality that P & G's evidence is not fully developed. Amway's motion is premature.

This is not to say that Amway is required affirmatively to prove that P & G has not sustained damages or that Amway would not prevail on a similar motion if it were to be filed at a later date, but merely that the record is not yet sufficiently developed. For example, Amway has not shown that P & G will bear the burden of demonstrating actual damages for certain of its claims or that P & G will ultimately bear the burden of apportioning its out-of-pocket damages. Neither has Amway shown that the Affidavit of Robert E. Hall is contradicted by evidence in the record or suffers some other deficiency that would render it insufficient to withstand a motion for summary judgment.

### 3. *Conclusion*

Amway's motion is denied as premature.[4]

### F. Amway's Motion for Summary Judgment on P & G's Vicarious Liability and Negligent Supervision claims.

Amway moves for summary judgment on P & G's vicarious liability and negligent supervision claims on the grounds that no employment or agency relationship exists between Amway and its independent distributors. P & G opposes Amway's motion by requesting a stay of further briefing pursuant to Rule 56(f) until P & G's Rule

---

3. In the final section of its responsive memorandum, Amway moves the court to sanction P & G for its conduct with respect to the search-term matter. P & G moved to strike Amway's request for sanctions on the grounds that P & G has not acted vexatiously and that Amway failed to file a written motion requesting the relief as required by Rule 7(b)(1). Both motions are denied.

4. Given this decision, P & G's motion to strike is vacated as moot. Also, to remove any potential for misunderstanding, the court's decision to deny Amway's motion is not reached pursuant to Rule 56(f), but on the basis that Amway has failed to satisfy its burden of production.

72(a) objection and the distributor defendants' jurisdictional motions have been resolved and P & G has been allowed to conduct any discovery that may then be permitted. P & G's request is granted.[5] P & G's opposition memorandum shall be due twenty days after the later of the date Musgrove's deposition is complete or the date Amway provides the e-mail communications pursuant to Judge Boyce's [now modified] order of February 27, 1997.

### G. P & G's Motion for Summary Judgment on Amway's Counterclaims.

P & G moves for summary judgment on Amway's three counterclaims. Amway alleges that representations made by P & G in two press releases concerning this lawsuit violate the Lanham Act and the Utah Truth in Advertising Act and that P & G is liable for abuse of process in filing this suit against Amway.

### 1. Amways Lanham Act Claim.

As it pertains here, the Lanham Act subjects to liability any person who, in connection with any goods or services, uses any false or misleading representation of fact in commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. *15 U.S.C.A. § 1125(a)(1)(B) (1998).* P & G contends that Amway's claim fails because the press releases do not contain false statements *made in connection with any product* and because the press releases do not constitute commercial advertising or promotion.

■ In response to P & G's first contention, Amway points to a sentence in the press releases that states, "Amway competes directly with P & G in a number of our product lines." This is not sufficient to bring the press releases within the scope of the statute. "Notwithstanding that the Act encompasses a broad range of misrepresentations, it is clearly directed only against false representations in connection with the sale of goods

or services in interstate commerce." *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141 (S.D.N.Y.1990).

■ In response to P & G's second contention, Amway argues that the press releases amount to unpaid publicity, which can constitute commercial promotion. A four-factor test applies to determine whether representations constitute commercial advertising or promotion:

(1) the representations must be "commercial speech;"

(2) they must be made by a defendant who is in commercial competition with the plaintiff;

(3) they must be made for the purpose of influencing customers to buy defendant's goods or services; and

(4) they must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Garland Co. Inc. v. Ecology Roof Systems Corp.,* 895 F.Supp. 274, 277 (D.Kan.1995) *(quoting Gordon and Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521 (S.D.N.Y.1994)).* The Supreme Court has defined "commercial speech" as speech that proposes a commercial transaction. *Bolger v. Young's Drug Prods. Corp.,* 463 U.S. 60, 66, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983). Notwithstanding the possibility that the press releases may have affected the parties' sales, they do not propose a commercial transaction. Amway cannot overcome this hurdle.

### 2. Amway's Utah Truth in Advertising Act Claim.

■ The Utah Truth in Advertising Act (the "Act") provides that its purpose "is to prevent deceptive, misleading, and false advertising practices and forms" and mandates that it "is to be construed to accomplish that purpose and not to inhibit any particular form of advertising so long as it is truthful and not otherwise misleading or deceptive."

---

5. To the extent P & G may also seek a stay pending resolution of issues raised by its three motions to compel or issues related to the conduct of Rule 30(b)(6) depositions, P & G's request is denied.

*Utah Code Ann. § 13–11a–1.* P & G contends that Amway cannot establish a claim under the Act because the press releases do not fall within the Act's definition of "advertising"—that is, "any written, oral, or graphic statement or representation made by a supplier in connection with the solicitation of business." *Utah Code Ann. § 13–11a–2(1).*

P & G asserts that the press releases were not issued in connection with solicitation of business. Although Amway argues that there is a genuine issue of fact as to whether the press releases solicit business, this court effectively determined they do not solicit business by ruling above that they do not "propose a commercial transaction."

Amway's primary line of defense is its argument that the conduct at issue falls within the scope of one of the deceptive trade practices that are specifically enumerated in the Act. Under § 13–11a–3(1)(h), a deceptive trade practice occurs when "a person disparages the goods, services, or business of another by false or misleading representation of fact."

As a particularized description of the conduct prohibited by the Act, the language in this subsection would usually trump the more general language contained in the Act's statement of purpose. However, the specific directive in the statement of purpose to construe the rest of the Act to accomplish the narrow purpose of preventing misleading advertising requires a different result. The statement of purpose effectively imposes an overarching requirement that otherwise actionable conduct constitute advertising. The press releases are not advertising.

### 3. Amway's Abuse of Process Claim.

A claim for abuse of process requires two elements: (1) an ulterior purpose and (2) an act in the use of process which is not proper in the regular prosecution of a lawsuit. *Kool v. Lee,* 43 Utah 394, 134 P. 906, 909 (1913). Amway claims that the instant lawsuit was filed for the improper collateral purpose of fostering negative publicity about Amway. P & G opposes Amway's claim on the grounds that fostering negative publicity and conducting an aggressive media campaign have not been found improper by other courts in the prosecution of a proceeding. *See, e.g, Perry v. Manocherian,* 675 F.Supp. 1417, 1429 (S.D.N.Y.1987). This court agrees.

### 4. Conclusion.

Therefore, P & G's motion for summary judgment on Amway's counterclaims is granted.